TRACY L. WILKISON
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK (CBN: 149883)
Assistant United States Attorney
Chief, Asset Forfeiture Section
    312 North Spring Street, 14th Floor
    Los Angeles, California 90012
    Telephone: (213) 894-6166
    Facsimile: (213) 894-0142
    E-mail: Steven.Welk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>      vs.<br><br>APPROXIMATELY $107,539,422.29<br>IN FUNDS AND SECURITIES,<br><br>    Defendant. | NO. 2:18-CV-3855<br><br>VERIFIED COMPLAINT FOR<br>FORFEITURE *IN REM*<br><br>[18 U.S.C. § 981(a)(1)(A) and (C)]<br><br>[F.D.A. and I.R.S.] |

The United States of America brings this claim against the defendant approximately $107,539,422.29 in funds and securities, and alleges as follows:

## I.    JURISDICTION AND VENUE

    1.    This is a civil forfeiture action brought pursuant to 18 U.S.C.

§ 981(a)(1)(A) and (C).

2.     This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3.     Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## II.   PERSONS AND ENTITIES

4.     The plaintiff is the United States of America.

5.     The defendants are:

a.     All funds and securities on deposit as of June 4, 2014, in Deutsche Bank Securities, Inc. account number 5XL-066365 ("DB 6365"), held in the name of Property Care Insurance, Inc. ("PCI").[1]

(i)     The opening deposit into this account was made on June 7, 2011.  The signatory on the account is Cindy Omidi ("C. Omidi"), President. The mailing address shown on the bank statements for this account is P.O. Box 24947, Los Angeles CA 90024 which has been held by the Omidis since 2000.

(ii)     The funds and securities in DB 6365 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 6365 was approximately $19,088,200.31.   Following the seizure, the account was re-designated as account number 5XL-001768, and placed under the control of the United States Marshals Service ("USMS"), the government custodian of the account.  On May 12, 2015, pursuant to an agreement between the government and PCI, the sum of $2,250,000 was released from government custody to Sheppard, Mullin, Richter, and Hampton, LLP (PCI's counsel at the time) for application to the expenses of a discovery-related matter.  No other funds have been released.  The account and its

---

[1] References to bank accounts consist of an abbreviation of the bank name ("DB" for Deutsche Bank Securities, Inc.; "WFB" for Wells Fargo Bank; "BofA" for Bank of America; and "Chase" for JP Morgan Chase Bank), followed by the last four digits of the account number.

remaining contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

b.     All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-066605 ("DB 6605"), held in the name of PCI.

(i)     The opening deposit into this account was made on June 8, 2011.  The signatory on the account is C. Omidi, President.  The mailing address shown on the bank statements for this account is P.O. Box 24947, Los Angeles CA 90024.

(ii)     The funds and securities in DB 6605 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 6605 was approximately $2,707,785.01.   Following the seizure, the account was re-designated as account number 5XL-001776, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

c.     All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-069112 ("DB 9112"), held in the name of The Asset Management Irrevocable Trust MO UAD 01/27/12, AsiaTrust Limited (Trustee), FBO C. Omidi and M. Omidi, et al.  M. Omidi was the principal.

(i)     The opening deposit into this account was made on March 8, 2012.  The Trust Authorization for this account was signed on February 29, 2012, by Angela Pope and Lora Tauira on behalf of AsiaTrust Nevis Limited.

(ii)     The funds and securities in DB 9112 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 9112 was approximately $22,372,928.27.   Following the seizure, the account was re-designated as account

3

number 5XL-001784, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

        d.    All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-878033 ("DB 8033"), held in the name of The Asset Management Irrevocable Trust MO UAD 01/27/12, AsiaTrust Limited (Trustee), FBO C. Omidi and M. Omidi, et al.

        (i)    The opening deposit into this account was made on May 1, 2013.  The Option Agreement and Approval Form for this account was signed by Angela Pope and Lisa Iro on January 15, 2013.

        (ii)    The funds and securities in DB 8033 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 8033 was approximately $3,701,563.30.   Following the seizure, the account was re-designated as account number 5XL-001800, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

        e.    All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-878272 ("DB 8272"), held in the name of The Asset Management Irrevocable Trust MO UAD 01/27/12, AsiaTrust Limited (Trustee), FBO C. Omidi and M. Omidi, et al.

        (i)    The opening deposit into this account was made on August 12, 2013.  The Option Agreement and Approval Form for this account was signed by Angela Pope and Lora Tauira, on behalf of AsiaTrust Nevis Limited, on July 29, 2013.

4

(ii)     The funds and securities in DB 8272 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 8272 was approximately $1,161,361.28.   Following the seizure, the account was re-designated as account number 5XL-001818, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

f.     All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-069120 ("DB 9120"), held in the name of The Asset Management Irrevocable Trust UAD 01/27/12, AsiaTrust Limited (Trustee), FBO C. Omidi and M. Omidi, et al  (J. Omidi was the principal).

(i)     The opening deposit into this account was made on March 8, 2012.  The Trust Authorization for this account was signed by Angela Pope and Lora Tauira, on behalf of AsiaTrust Nevis Limited, on February 29, 2012.

(ii)     The funds and securities in DB 9120 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 9120 was approximately $24,082,619.37.   Following the seizure, the account was re-designated as account number 5XL-001826, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

g.     All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-878025 ("DB 8025"), held in the name of The Asset Management Irrevocable Trust UAD 01/27/12, AsiaTrust Limited (Trustee), FBO C. Omidi and M. Omidi, et al  (J. Omidi was the principal).

(i)      The opening deposit into this account was made on May 2, 2013.  The Option Agreement and Approval Form for this account was signed by Angela Pope and Lisa Iro on January 15, 2013.

(ii)      The funds and securities in DB 8025 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 8025 was approximately $3,696,338.19.  Following the seizure, the account was re-designated as account number 5XL-001842, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

h.      All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-878264 ("DB 8264"), held in the name of The Asset Management Irrevocable Trust UAD 01/27/12, AsiaTrust Limited (Trustee), FBO C. Omidi and M. Omidi, et al (J. Omidi was the principal).

(i)      The opening deposit into this account was made on August 12, 2013.  The Option Agreement and Approval Form for this account was signed by Angela Pope and Lora Tauira on July 29, 2013.

(ii)      The funds and securities in DB 8264 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 8264 was approximately $1,161,361.29.  Following the seizure, the account was re-designated as account number 5XL-001859, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

i.      All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-069104 ("DB 9104"), held in the name of

6

The Asset Management Irrevocable Trust CO UAD 01/27/12, AsiaTrust Limited (Trustee), FBO C. Omidi and M. Omidi, et al.  C. Omidi was the principal.

(i)     The opening deposit into this account was made on March 8, 2012.  The Trust Authorization for this account was signed by Angela Pope and Lora Tauira, on behalf of AsiaTrust Limited, on February 29, 2012.  The account statements showed the same P.O. Box mailing address as the accounts described above.

(ii)     The funds and securities in DB 9104 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 9104 was approximately $220,947.56.  Following the seizure, the account was re-designated as account number 5XL-001867, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during the pendency of this action.

j.     All funds and securities on deposit as of June 4, 2014, in Deutsche Bank account number 5XL-878579 ("DB 8579"), held in the name of PCI.

(i)     The opening deposit into this account was made on April 2, 2014.  The Option Agreement and Approval Form for this account was purportedly signed by C. Omidi on March 31, 2014.

(ii)     The funds and securities in DB 8579 were seized on June 4, 2014, pursuant to a federal seizure warrant.  At the time of the seizure, the net value of the funds and securities on deposit in DB 8579 was approximately $14,299,287.71.  Following the seizure, the account was re-designated as account number 5XL-001875, and placed under the control of the USMS, the government custodian of the account.  The account and its contents are, and shall remain, in the custody and control of the USMS, and under the jurisdiction of this Court, during

7

the pendency of this action. (The defendant funds and securities described in subparagraphs (a) through (j) are referred to collectively as the "DB Assets").[2]

        k.    $5,630,385.00 in funds seized pursuant to a federal seizure warrant on June 24, 2014, from Bank of America account number 11548-63195 ("BofA 3195"), held in the name of PCI.

        (i)    The opening deposit into this account was made on December 31, 2009.  The signatory is C. Omidi, as President of PCI.  The mailing address shown on the bank statements for PCI from the opening of the account through February 28, 2011, was 9001 Wilshire Boulevard, Beverly Hills, CA 90211, an address leased and controlled by the Omidis.  The mailing address shown on the bank statements from March 1, 2011 through April 30, 2015 is P.O. Box 24947, Los Angeles CA 90024.

        (ii)    The funds seized from BofA 3195 are in the custody of the United States Treasury Department ("Treasury"), the government custodian of the funds, and shall remain in the custody and control of the Treasury, and under the jurisdiction of this Court, during the pendency of this action.

        l.    $11,666,645.00 in funds seized pursuant to a federal seizure warrant on June 24, 2014, from Bank of America account number 11548-63190 ("BofA 3190"), held in the name of PCI.

        (i)    The opening deposit into this account was made on December 30, 2009.  The signatory is C. Omidi, as President of PCI.  The mailing

---

[2] The value of the funds and securities in the DB Accounts since their seizure has fluctuated, and is expected to continue to do so.  Since the seizure, the only activity in the DB Accounts has been the accrual of interest, trades and acquisitions that occurred pursuant to instructions provided by the account holders prior to the seizure (including put and call options that have since expired), and changes in the securities holdings resulting from actions by the issuers of the securities held.  The government has ordered no trades of any securities in the DB Accounts since the seizure date.

address shown on the bank statements for PCI from the opening of the account through February 28, 2011, was 9001 Wilshire Boulevard.  The mailing address shown on the bank statements from March 1, 2011 through the present is P.O. Box 24947.

(ii)     The funds seized from BofA 3190 are in the custody of the Treasury, the government custodian of the funds, and shall remain in the custody and control of the Treasury, and under the jurisdiction of this Court, during the pendency of this action.  (The defendant funds described in subparagraphs (k) and (l) are referred to collectively as the "BofA Assets").

6.     This complaint alleges a fraud scheme involving a network of more than 200 entities that worked together to promote, perform, and submit insurance claims for Lap-Band surgeries and other medical procedures, including sleep studies and nutritional and psychological services, in the Central District of California and elsewhere, between at least in or about 2008 and the present.  In addition to the parties identified above (which are the holders of the accounts in which the defendant assets are held or from which they were seized), there are or were numerous entities that are or were owned and/or controlled by one or more of C. Omidi, Michael Omidi ("M. Omidi") and Julian Omidi ("J. Omidi") (collectively, "the Omidis"), as well as associates of the Omidis who conspired with one or more of them or otherwise facilitated the illegal activities described herein.  The Omidis and the associated individuals and entities listed below acted in knowing concert to commit the acts alleged in this complaint, resulting in the fraudulent collection of more than $200 million in payments from insurance companies, individuals who had health insurance with those insurance companies, employer health plans, employees insured by those health plans, government health care programs and others.  Collectively, the Omidis, the entities identified in paragraph 5 above, the associated individuals and entities listed below, and additional unnamed entities that are or were owned or controlled by the Omidis

9

during any part of the relevant period, are referred to herein as "GET THIN" or "the GET THIN entities."  GET THIN was controlled by the Omidis who, together with others: (a) set and reviewed GET THIN's policies and procedures, including policies and procedures with respect to the services GET THIN would provide, the billing for those services, and materials submitted to insurance companies and others responsible for health care plans; (b) reviewed individual patient files and claims for services submitted to insurance carriers; (c) approved GET THIN expenses; and (d) engaged in the financial transactions described herein, which were undertaken with the intent to obtain money through misrepresentation and omissions of material facts, promote the illegal scheme described herein (including the individual illegal acts that made up the scheme), and conceal or disguise the nature, source, location, ownership and control of the proceeds of the scheme and its underlying illegal acts.  The majority of the financial accounts described herein were controlled by the Omidis, meaning that one or more of the Omidis is or was a named accountholder or an authorized signer on the account, with the authority to make withdrawals, deposits or transfers, or exercised control through a straw or nominee account holder.  (These accounts are referred to herein as "Omidi-controlled accounts" or "accounts controlled by the Omidis," and include the business accounts for the GET THIN entities, including those where associates had signature authority.)  Not all of the entities owned and/or controlled by the Omidis are listed below or described in this complaint, but the individuals and entities listed were among those involved in some material way in the commission of the acts described herein.

        a.     Property Care Insurance, Inc. ("PCI") was incorporated in Nevis on December 15, 2009.  C. Omidi was (and is believed to be) PCI's President and Secretary.  She was and is also a director, along with Jackie Hunkins-Taylor.  C. Omidi is believed to be the sole registered shareholder of PCI.

10

b.      The Asset Management Irrevocable Trust - MO was formed on January 27, 2012, with M. Omidi as the "principal." The trust was formed under Nevis law, and the trust instrument is believed to have been signed by M. Omidi. The listed beneficiaries of the trust are J. Omidi, C. Omidi, M. Omidi, Shawn Pezeshk ("Pezeshk"), Edjlal Pezeshk, and Sharafatal Aghajani ("Aghajani"). The trust instrument names AsiaTrust Nevis Limited as trustee, and identified AsiaTrust Nevis Limited's place of registration, incorporation, and principal place of business as Nevis. Pezeshk and Edjlal Pezeshk are believed to be relatives of the Omidis. C. Omidi's DMV records show that she was once known as Nahid Pezeshk Omidi.

c.      The Asset Management Irrevocable Trust was formed on January 27, 2012, with J. Omidi as the "principal," under Nevis law. The trust instrument appears to have been signed by J. Omidi. The listed beneficiaries of the trust are J. Omidi, C. Omidi, M. Omidi, Pezeshk, Edjlal Pezeshk, and Aghajani. The trustee is AsiaTrust Nevis Limited.

d.      The Asset Management Irrevocable Trust - CO was formed on January 27, 2012, with C. Omidi as the "principal." The trust was formed under Nevis law and the trust instrument appears to have been signed by C. Omidi. The listed beneficiaries of the trust are J. Omidi, C. Omidi, M. Omidi, Pezeshk, Edjlal Pezeshk, and Aghajani. AsiaTrust Nevis Limited was the trustee.

e.      Surgery Center Management, LLC ("SCM") was a limited liability company organized in California on February 12, 2010. According to statements of information filed on October 7, 2010 and February 25, 2011, Charles Klasky ("Klasky") was manager. SCM used the address 269 Beverly Drive, Suite 353, Beverly Hills, California 90212 (the "Suite 353 Address"). SCM had multiple bank accounts, including accounts at Wells Fargo Bank ("WFB") from in or about July 2010 until in or about March 2012. Klasky was an employee of SCM starting in or about July 2010. According to bank signature cards from WFB, J. Omidi was

11

the CEO of SCM and C. Omidi was the Office Manager in 2010.  A signature card from BofA, also from 2010, appears to contain the signature of M. Omidi as the "Managing Member" of SCM.

f.    GSPM was organized in California on February 1, 2012, with Alexander Weisse ("Weisse") as the organizer.  According to statements of information filed on March 8, 2012 and May 9, 2013, Pezeshk was the CEO and manager or member.

g.    Independent Medical Services, Inc. A Professional Corporation, ("IMS") incorporated in California on April 9, 2010, operating primarily in Beverly Hills, California, and used the Suite 353 Address.  Robert Silverman ("Silverman") was the incorporator.  According to a statement of information filed on January 13, 2012, Elliot Alpert ("Alpert") was CEO, CFO, and director.  Klasky was listed as secretary.

h.    On or about March 15, 2012, IMS entered into an assignment agreement with GSPM, under which IMS assigned to GSPM, among other things, all of its rights, title, and interest in and to all accounts receivable, rights to receive monies, and payments for services rendered by IMS and its physicians.  In the agreement, IMS described as its property a number of entities, including VIMA Medical, Inc., a professional corporation ("VIMA").  VIMA was incorporated on May 16, 2011 in California.  According to a statement of information filed on May 22, 2012, Alpert was the CEO, secretary, CFO, and director.  Weisse was the incorporator.

i.    Top Surgeons, Inc. ("Top Surgeons") was incorporated in California on July 6, 2006.  According to a statement of information filed on December 11, 2006, M. Omidi was CEO, secretary, CFO, and director.  A statement of information showing no changes was filed on May 3, 2007.  Top Surgeons, Inc. was converted to an LLC (with the same name) on May 14, 2008. According to a statement of information filed on September 14, 2009, C. Omidi

12

was CEO and J. Omidi was manager or member.  According to statements of information filed on November 8, 2010, and November 22, 2011, Klasky was manager.[3]

j.      1-800-Get-Thin, LLC ("1-800-Get-Thin") was a limited liability company organized in California on March 11, 2010, operating in Beverly Hills, California.  Silverman was the organizer.  1-800-Get-Thin leased to SCM the "1-800-Get-Thin" telephone number (1-800-438-8446) and the URL "800getthin.com," from in or about 2010 to in or about 2015.  As of June 12, 2014, no statement of information was filed with the California Secretary of State.

k.      Royalty Surgical Center, LLC ("Royalty") was organized in California on November 15, 2013.  According to a statement of information filed on June 9, 2014, Tim Kollars was manager or member.

l.      DeVida USA, LLC ("DeVida") was organized in California on May 23, 2005.  J. Omidi was the organizer and the initial agent for process of service.  According to a statement of information filed on July 9, 2012, Klasky was CEO and manager or member.

m.      Modern Institute of Plastic Surgery and Antiaging, Inc. ("MIPS) was incorporated in California on May 26, 2005.  According to a statement of information filed on March 5, 2010, Ryan Andrew Stanton was CEO, secretary, CFO, and director.  According to a statement of information listing, no changes was filed on June 18, 2013.  According to a statement of information filed on September 10, 2014, Pezeshk was CEO, CFO, secretary and director.  According to a statement of information filed on May 25, 2016, Jamie Hildago was CEO, CFO, secretary and director.

---

[3] Additionally, Top Surgeons, LLC was organized in Nevada on December 10, 2008.  The Nevada Secretary of State website listed Klasky and J. Omidi as managers.

n.      Forward Business Solutions, LLC ("FBS") was organized in California on January 10, 2012.  Weisse was the organizer.  According to statements of information filed on July 9, 2012 and October 2, 2013, Pezeshk was CEO and member or manager.

o.      Almont Ambulatory Surgery Center, A Medical Corporation ("Almont") was incorporated in California on August 8, 2005.  According to statements of information filed on November 7, 2005 and July 3, 2007, M. Omidi was CEO, secretary, CFO, and director.  Almont was converted to an LLC (with the same name) on December 16, 2009.  The conversion paperwork listed M. Omidi as president and secretary.  According to a statement of information filed on February 25, 2011, Klasky was manager.

p.      Bakersfield Surgery Institute, Inc. ("BSI") was incorporated in California on July 6, 2006.  According to statements of information filed on April 26, 2007 and May 15, 2008, M. Omidi was CEO, secretary, CFO, and director.  BSI was converted to an LLC (with the same name) on June 20, 2008.  The conversion paperwork listed M. Omidi as president and secretary.  According to a statement of information filed on September 14, 2009, C. Omidi was CEO and J. Omidi was manager or member.  According to a statement of information filed on February 25, 2011, Klasky was manager.  According to a statement of information filed on July 9, 2012, Alpert was CEO and manager or member.

q.      Silicon Valley Ambulatory Surgery Center, LLC was organized in California on November 23, 2010.  The name was changed on June 3, 2011 to CIRO Surgery Center, LLC.  A statement of information filed on July 9, 2012 listed Alpert as the CEO and manager or member.

r.      East Bay Ambulatory Surgery Center, LLC was organized in California on November 15, 2010.  Weisse was the organizer.  According to a statement of information filed on February 21, 2013, Pezeshk was CEO and member or manager.

s.      New Life Surgery Center, LLC was organized in California on June 9, 2010.  Weisse was the organizer.  According to a statement of information filed on January 14, 2013, Pezeshk was CEO and member or manager.

t.      Beverly Hills Surgery Center, LLC was organized in California on June 10, 2009.  According to a statement of information filed on August 3, 2009, J. Omidi was CEO, and C. Omidi was manager or member.  According to a statement of information filed on July 9, 2012, Alpert was CEO and manager or member.

u.      Orange Grove Surgery Center, LLC was organized in California on February 24, 2011 by Weisse.  According to a statement of information fled on October 1, 2012, Pezeshk was CEO and manager or member.

v.      Palmdale Ambulatory Surgery Center, A Medical Corporation was incorporated in California on November 4, 2005.  M. Omidi was the initial agent for service of process.  According to a statement of information filed on November 5, 2007, M. Omidi was CEO, secretary, CFO, and director.  It was converted to Palmdale Ambulatory Surgery Center, LLC pursuant to a document filed on June 20, 2008, which was signed by M. Omidi as president and secretary and J. Omidi was listed as the agent for service of process.  According to a statement of information filed on February 25, 2011, Klasky was manager.

w.      San Diego Ambulatory Surgery Center, LLC was organized in California on December 15, 2009.  J. Omidi was the organizer.  According to a statement of information filed on February 25, 2011, Klasky was manager.  According to a statement of information filed on October 1, 2012, Pezeshk was CEO and R. Macatangay ("Macatangay") was manager or member.

x.      San Joaquin Valley Surgery Center, LLC was organized in California on March 4, 2011.  Weisse was the organizer.  According to a statement of information filed on October 1, 2012, Alpert was CEO and manager or member.

y.      Skin Cancer and Reconstructive Surgery Specialists of Beverly Hills, A Medical Corporation, was incorporated in California on October 31, 2005. According to statements of information filed on December 31, 2009 and August 9, 2011, M. Omidi was CEO, secretary, CFO, and director.  According to the statement of information filed on August 9, 2011, Thomas Cloud was also a director.  According to a statement of information filed on October 9, 2012, Pezeshk was CEO, secretary, CFO, and director.

z.      Skin Cancer and Reconstructive Surgery Specialists of West Hills, A Medical Corporation, was incorporated in California on October 31, 2005. According to a statement of information filed on December 31, 2009, M. Omidi was CEO, secretary, CFO, and director.  According to a statement of information filed on October 9, 2012, Pezeshk was CEO, secretary, CFO, and director.

aa.     Valencia Ambulatory Surgery Center, LLC ("VASC") was organized in California on December 15, 2009 by J. Omidi.  According to a statement of information filed on February 25, 2011, Klasky was manager. According to a statement of information filed on October 5, 2012, Pezeshk was CEO and member or manager.

bb.     West Hills Surgery, LLC was organized in California on June 15, 2010.  Weisse was the organizer.  According to a statement of information filed on February 11, 2013, Pezeshk was CEO and member or manager.

cc.     Cosmopolitan Plastic and Reconstructive Surgery, A Medical Corporation ("Cosmopolitan"), was incorporated in California on February 11, 2005.  According to statements of information filed on April 27, 2005 and June 8, 2010, M. Omidi was CEO, secretary, CFO, and director.  According to a statement of information filed on October 9, 2012, Pezeshk was CEO, secretary, CFO, and director.

dd.     Beverly Hills Anesthesia, LLC; Beverly Hills Surgery, LLC; Valencia Laboratory, LLC; Valencia Ultrasound, LLC; West Hills Anesthesia,

16

LLC; West Hills Gastroenterology, LLC; West Hills Laboratory, LLC; West Hills Ultrasound, LLC; and West Hills Surgery, LLC were organized in California between June 7 and 15, 2010.  The organizer for each was Weisse.  According to statements of information filed for these entities with the California Secretary of State between July 9, 2012 and February 21, 2013, Pezeshk was the CEO and manager, or member, for each.

ee.     Patient Advocacy Law Group, A California Public Benefit Corporation, was incorporated in California on November 8, 2010, with Silverman and Edmond DeFrank ("DeFrank") listed as directors.  According to a statement of information filed on September 8, 2011, DeFrank was CEO, secretary, CFO, and director.

ff.     Palmdale Ambulatory Surgery Center, A Medical Corporation ("PASC"), was incorporated in California on November 4, 2005.  According to a statement of information filed on November 5, 2007, M. Omidi was CEO, secretary, CFO, and director.  PASC was converted to an LLC in California on June 20, 2008.  The conversion paperwork listed M. Omidi as president and secretary.  According to a statement of information filed on February 25, 2011, Klasky was manager.

gg.     Valley Surgical Center, Inc. was incorporated in California on July 6, 2006 with M. Omidi listed as the initial director.  According to a statement of information filed on June 29, 2007, M. Omidi was CEO, secretary, CFO, and director, with C. Omidi listed as the agent for service of process.  A Certificate of Dissolution was filed on May 29, 2009.  Valley Surgical Center, LLC ("VSC") was organized in California on December 15, 2009 by J. Omidi.  According to a statement of information filed on February 25, 2011, Klasky was manager. According to a statement of information filed on February 11, 2013, Pezeshk was CEO and member or manager.

17

hh.     1Search1, LLC was organized in California on February 23, 2006.  According to a statement of information filed on August 31, 2012, Ralph Almeida was member or manager.

ii.     Airuslife, Inc. was incorporated in Nevada on December 16, 2010.  The Nevada Secretary of State identified DeFrank as secretary and treasurer, and Larry Twersky as president and director as of May 1, 2012.

jj.     VCFB Management, Inc.; WL Medical Solutions, Inc.; Call Us Now, Inc.; Capital Market Solutions, Inc.; ASC Capital Management, Inc.; and Hospital and ASC Management Services, Inc. were incorporated in Nevada on December 16, 2010.  The Nevada Secretary of State identified Klasky as president, secretary, treasurer, and director of each entity.[4]

kk.     CIEL Promotions, Inc. and ASC Advertising and Marketing, Inc. were incorporated in Wyoming on December 23, 2010.

ll.     Search Engine Placement Labs, LLC was organized in California on March 29, 2006, with DeFrank as the organizer.  According to a statement of information filed on August 14, 2006, DeFrank was the CEO and Mark Capuano was a manager or member.  According to a statement of information filed on November 15, 2010, Klasky was manager.

mm.   Medical Payment Processing, LLC was organized in California on August 4, 2010.  Weisse was the organizer.  According to a statement of information filed on July 9, 2012, Pezeshk was CEO and manager or member.

nn.     Pacific West Dermatology, A Medical Corporation, was incorporated in California on April 2, 2001.  According to a statement of information filed on July 31, 2006, J. Omidi was president, secretary, CFO, and

---

[4] VCFB Management, Inc. filed a "Statement and Designation by Foreign Corporation" with the California Secretary of State on September 19, 2011.  It also filed "Articles of Incorporation with Statement of Conversion" with the California Secretary of State on May 6, 2013, converting it to a California Corporation.  No statement of information was filed in California as of October 25, 2013.

director.  According to a statement of information filed on March 5, 2008, M. Omidi was president, secretary, CFO, and director.  The corporation was dissolved on October 16, 2008 by J. Omidi as president, secretary, and treasurer.  Pacific West Dermatology, LLC was organized in California on March 1, 2010. According to a statement of information filed on February 25, 2011, Klasky was manager.

    oo.    OCM 26, LLC was organized in Nevada on January 15, 2010. The Nevada Secretary of State website listed William Granich as the managing member, but earlier Nevada Secretary of State documents list J. Omidi as managing member.

    pp.    FJKJ, LLC was organized in California on April 30, 2010.  The organizer was Weisse.  No statement of information was filed with the California Secretary of State as of October 24, 2013.

    qq.    Beverly Hills Estate, LLC was organized in California on April 14, 2011.  According to a statement of information filed on November 26, 2012, C. Omidi was CEO and manager or member.

    rr.    Summit Circle Properties, LLC was organized in California on March 29, 2011.  The organizer was Weisse.  No statement of information was filed with the California Secretary of State as of October 25, 2013.

## III.    OVERVIEW

### A.    Lap-Band Surgery and Bariatric Coverage

7.    Lap-Band surgery[5] (a type of bariatric surgery) was an elective weight-loss procedure that employed the Lap-Band, a restricted device, manufactured by Allergan, Inc. through 2013, when it sold that line of business to

---

[5] The introduction of a Lap-Band device into a patient required actual surgery.  Unless indicated otherwise, references to a Lap-Band "surgery" refer to the surgery itself.  References to the Lap-Band "procedure" include surgery and the various pre- and post-operative processes associated with or in preparation for the actual surgery.

19

another company. Both the Lap-Band device and the surgical procedure in which it was employed were regulated by the United States Food and Drug Administration ("FDA").

8.      Lap-Band surgery was intended for morbidly obese adult patients who met specific criteria based on their body mass index ("BMI"), had failed more conservative weight-reduction alternatives, and were committed to making various permanent changes in their eating habits.

9.      If a patient had bariatric coverage through his or her health insurance, the insurer typically required that the Lap-Band surgery be pre-approved by the insurer before a provider could bill and obtain payment for the surgery and related pre and post-operative services and procedures.  A patient with bariatric coverage generally would be pre-approved and the Lap-Band surgery deemed medically necessary only if, among other requirements, the patient either had a BMI of 40; or more, or a BMI of 35 or more and at least one co-morbidity, such as obstructive sleep apnea ("OSA"), typically diagnosed through a sleep study.

10.      In order to obtain pre-approval for Lap-Band surgery, the medical provider typically submitted a pre-authorization request (also known as a letter of medical necessity or "LOMN") that purported to establish the justification for the Lap-Band procedure with documentation showing that the patient was morbidly obese and met all of the additional qualifications of the particular plan, including documentation of any co-morbidity.

11.      Beginning in 2008, and lasting until an unknown date, but at least until approximately March 2016, the Omidis, the GET THIN entities, and others participated in a scheme to defraud health insurance plans, patients and the FDA through the network of GET THIN entities.  GET THIN, as defined in paragraph 6 above, used misleading advertising to solicit patients for Lap-Band surgery and then operated as an insurance billing mill, with fraudulent conduct at virtually every step along the way, knowingly and with intent to defraud, devising,

20

participating in and executing a scheme to defraud TRICARE[6] and numerous insurance companies[7] as to material matters, and to obtain money and property from the Insurance Companies by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, resulting in substantial losses to the Insurance Companies.[8]  The fraudulent scheme was executed through the use of the mails and interstate wire communications, including email.  In addition to affirmative misrepresentations, the Omidis, the GET THIN entities and others knowingly violated their duties to disclose material facts to the Insurance Companies and others, by omitting those facts in communications with the Insurance Companies and others.  These actions were in violation of Title 18, United States Code, Sections 1035 (false statements relating to healthcare matters); 1341 (mail fraud); 1343 (wire fraud); 1347 (healthcare fraud); and 1349 (conspiracy to commit health care fraud).  The scheme ultimately generated hundreds of millions of dollars in revenue, most of which was then laundered through financial transactions designed to conceal the nature, location, source, ownership, or control of the proceeds of the fraud, and/or promote the underlying illegal conduct in violation of Title 18, United States Code, Sections 1956 and 1957, as explained more specifically below.

---

[6] "TRICARE" is a federally-funded health care benefit program that provides coverage for active-duty, retired and reserve members of the United States military, and certain other individuals.

[7] The private insurers defrauded as a result of the scheme described herein included, but were not limited to, Anthem Blue Cross, UnitedHealthcare ("United"), Aetna, CIGNA, Health Net, Operating Engineers Health & Welfare Fund, Blue Shield of California, Government Employee's Health Association, Inc. ("GEHA"), and others.  The private insurers and TRICARE are referred to collectively herein as the "Insurance Companies."

[8] The Insurance Companies were, at all relevant times, health care benefit programs within the meaning of 18 U.S.C. §24(b).

21

12.     While the scheme changed over time, it generally involved the following elements:

a.      **Creation of Hundreds of Entities to Facilitate the Scheme.** The Omidis and their associates, including Silverman, Weisse, and Pezeshk, among others, created hundreds of entities and business names (dbas) with a variety of addresses, including many commercial mail receiving agencies ("CMRAs") such as UPS Stores.  This helped GET THIN hide the fact that one enterprise was submitting hundreds of millions of dollars worth of Lap-Band related medical claims to insurers, and to facilitate the downstream transfer of funds among the GET THIN entities, for the purpose of making it difficult to trace the disposition of payments received.

b.      **Concealment of the Omidis' Common Ownership and Control of the GET THIN Entities.**  Starting in about 2010, the Omidis titled their entities in nominee names and took other actions to mislead the FDA, insurance companies, and others regarding the common ownership and control of the GET THIN entities and the Omidis' common control of the overall GET THIN enterprise.

c.      **Misleading Advertising.**  Until early 2012, GET THIN lured patients through a barrage of advertising, including billboards, radio, and print media, that were affirmatively misleading and/or failed to adequately warn patients of the dangers involved in the Lap-Band procedure.  The ads typically directed patients to call "1-800-GET-THIN" or "1-800-GET-SLIM," or to access a website that was part of GET THIN.

d.      **Call Center.**  Callers who dialed either of the above numbers were routed to GET THIN's "Call Center," essentially a boiler room where employees were paid commissions based on the number of patients they induced to attend what were purported to be "free" seminars and undergo GET THIN medical procedures, including the Lap-Band procedure.  Call Center employees were

provided with scripts intended to induce patients to attend the seminars by representing that they were free, but failed to disclose the fact that attendance at the seminar likely would result in billing for a medical "consultation" to the patient's insurance provider as a physician office visit.

e. **Misrepresentations Regarding Coverage and Insurance Requirements.** GET THIN frequently misled patients into believing their insurance covered the Lap-Band procedure when it did not, and falsely told patients that their insurance required them to undergo various medical procedures in order to be eligible to receive the surgery. This resulted in patients whose insurance did not include coverage for Lap-Band surgery (or who did not qualify for such coverage) undergoing expensive "pre-operative" procedures that they would not have undergone if not for the misrepresentations. Those unnecessary or unwanted procedures resulted in billings by GET THIN to insurers and patients, and payments in satisfaction of those billings, which were sent through the mails and over interstate wire media. These misrepresentations were material, and were relied upon by the insurers in making determinations whether to pay on claims submitted by GET THIN.

f. **Routine Waiver of Co-Payments.**[9] GET THIN routinely induced patients to undergo procedures, usually characterized as pre-operative or necessary for preauthorization for a separate procedure or surgery, by offering to waive co-payments in their entirety or leading patients to believe that the procedures would cost them little or nothing. Co-payments are material requirements for insurers, and these inducements typically negate the obligation of the insurance plans to pay for such services, obligating the patients to pay the entire cost. In addition, by offering such inducements, GET THIN was

[9] A "co-payment" is a payment required of an insured person for that portion of medical expenses not paid by the insurer. In some cases, it is a fixed fee (*e.g.*, for a doctor visit or prescription).

misrepresenting its actual rates when billing insurers, which the insurers also consider material.

g.   **Misrepresentations and Omissions Resulting in Insurance Pre-Authorizations for Lap-Band Surgeries.**  GET THIN routinely obtained pre-authorization for Lap-Band surgery from insurers, giving GET THIN the ability to bill for and obtain payment for surgery and related pre-operative and post-operative services and procedures by knowingly and intentionally using "cookie cutter" templates that were not based on the individual patients and otherwise included misrepresentations concerning the satisfaction of preconditions required for such authorizations.  These misrepresentations were material, and were relied upon by the insurers in making determinations whether to pay on claims submitted by GET THIN.

h.   **Misrepresentations to Insurers Concerning Pre-Operative Procedures.**  GET THIN billed pre-operative procedures to the insurers of patients using diagnostic codes that concealed the fact that the patients were undergoing the procedures as a precursor to Lap-Band surgery to treat obesity.  These misrepresentations were material, and were relied upon by the insurers in making determinations whether to pay on claims submitted by GET THIN.

i.   **False Billing for Sleep Studies.**  GET THIN routinely performed sleep study tests on patients who were seeking Lap-Band surgery knowing that (1) the patient's insurance did not cover Lap-Band surgery; or (2) the patient qualified for Lap-Band surgery without a sleep study.  In addition, beginning in 2010, GET THIN began billing insurance companies for facility fees for use of the MIPS -- an ambulatory surgery center in Beverly Hills, California -- for sleep studies when in fact no sleep studies were performed there.  These misrepresentations were material, and were relied upon by the insurers in making determinations whether to pay on claims submitted by GET THIN.

24

j.      **False Billing for Nutritional and Psychological Services.**  In some cases, GET THIN submitted to insurers false claims for reimbursement for nutritional counseling, psychological counseling, or psychological testing services that either were not provided or were not provided as represented in the claims. These misrepresentations were material, and were relied upon by the insurers in making determinations whether to pay on claims submitted by GET THIN.

k.      **Money Laundering.**  Payments from insurance companies that represented the proceeds of the fraud scheme described herein were deposited into accounts controlled by the Omidis, as defined above in paragraph 6, and then moved among numerous accounts, both to promote the fraudulent enterprise and to conceal the nature, source, location, ownership and control of the proceeds of the scheme.  In many cases, checks payable to one GET THIN entity were deposited directly into the account of another.  After the initial deposit into an account, the funds would be repeatedly transferred among different accounts with no apparent business purpose, a practice known as "layering" that makes it difficult to trace funds to their true source.  Some of the funds were transferred into accounts that GET THIN used to pay expenses, such as payroll, that promoted the enterprise. Other funds were ultimately transferred directly into a series of offshore trusts for the benefit of the Omidis and an offshore insurance company established by C. Omidi, or used to invest in securities held by those trusts, including the defendant DB Assets.  All of the defendant assets were involved in one or more of these money laundering transactions.

13.     While GET THIN was permeated with fraud, as explained herein, some of the monies it collected or manipulated during the course of the scheme may not have constituted fraud proceeds.  However, tainted and untainted funds were intentionally commingled by the Omidis without regard to the actual or potential legitimacy of the source.  The banking practices of the GET THIN entities and the Omidis were typical of money laundering activity, that is, they

25

were practices by which proceeds of criminal activity are commonly manipulated to conceal or disguise the nature, source, location, control or ownership of such proceeds, or to promote further criminal activity.

**B.**   **Some of The Insurers Detect The Fraudulent Scheme**

14.   By 2010 or early 2011, insurers had identified various GET THIN entities as sources of aberrant billing patterns and suspect practices.  For example,

a.   in 2011, Anthem Blue Cross stopped paying 36 GET THIN entities after concluding that the entities were performing physician services as LLC corporations, which is not legally allowed because physician services can only be performed under a professional corporation under California law.

b.   in February 2011, United placed GET THIN providers on pre-payment review and thereafter denied claims for which GET THIN failed to provide adequate supporting documentation.

i.   On March 20, 2014, numerous GET THIN entities (including Almont Ambulatory Surgery Center, LLC, Bakersfield Surgery Institute, LLC, CIRO Surgery Center, LLC, East Bay Ambulatory Surgery Center, LLC, MIPS, New Life Surgery Center, LLC, dba Beverly Hills Surgery Center, Orange Grove Surgery Center, LLC, Palmdale Surgery Center, LLC, San Diego Ambulatory Surgery Center, LLC, San Joaquin Valley Surgery Center, LLC, Skin Cancer & Reconstructive Surgery Specialists of Beverly Hills, Inc., VASC,  West Hills Surgery Center, LLC, and IMS) filed a federal civil action against United, several hundred employer sponsored health care plans administered by United, and the respective employers, alleging that the defendants had wrongfully refused to pay GET THIN for Lap-Band procedures and other services.  *Almont Ambulatory Surgery Center LLC, et al. v. UnitedHealth Group, Inc., et al.*, CV 14-2139-MWF-VBKx ("*Almont I*").

ii.   The complaint describes the plaintiffs as "a network of health providers that specialize in providing laparoscopic adjustable gastric band

("Lap-Band") surgery and other surgical procedures and medical services to individuals who are morbidly obese," and alleges that each of the surgery centers "operate[d] an ambulatory surgery center in Beverly Hills, California."

        iii.      The complaint further alleges that since 2010, plaintiffs had helped thousands of morbidly obese individuals to undergo Lap-Band surgery as well as other medical procedures, and estimated that roughly 90% of their patients were morbidly obese.

        iv.      The complaint further alleges that United was the single largest payor for plaintiffs and owed them "hundreds of millions of dollars," and that since 2010, United systematically and improperly withheld payments from plaintiffs.[10]

        v.      On March 21, 2014, all but two of the same GET THIN plaintiffs filed a complaint in California state court against United, using the same language to describe themselves.  That complaint also alleged that United had wrongfully refused to pay the GET THIN plaintiffs for Lap Band procedures and other services.

        vi.      United removed the March 2014 state case to federal court on April 21, 2014, and filed a counterclaim against the GET THIN entities, alleging that J. Omidi, M. Omidi, and GET THIN illegally conspired to (a) induce patients to obtain medical services by promising to waive co-payments and other patient financial obligations; and (b) submit fraudulent claims to induce United to pay for services that were not covered by insurance.  *Almont Ambulatory Surgery Center LLC, et al. v. UnitedHealth Group, Inc., et al.*, CV 14-3053-MWF-VBK ("*Almont II*").

        c.      Aetna began to investigate GET THIN in May 2009 after receiving a referral from the California Department of Insurance alleging that Top

---

[10] The plaintiffs in *Almont v. United Health Group* received at least $141.7 million in insurance income during the time period 2008-2012.

Surgeons was rendering cosmetic surgery to members and billing it as medically necessary.  In January 2010, Aetna determined that information provided to it by GET THIN in pre-certification (*i.e.*, pre-approval) materials was inaccurate and appeared templated.  Verification letters were distributed to members, and their responses confirmed that the information provided to Aetna by GET THIN was not accurate.  Based on the responses, Aetna determined that the pre-certification criteria were not met, and placed the GET THIN entities on pre-payment review.

d.      In early 2010, TRICARE identified aberrant professional and facility billing patterns, as well as questionable medical and billing practices that warranted further review, placed GET THIN on pre-payment review, and eventually stopped paying claims from known GET THIN entities.

e.      On April 14, 2014, CIGNA began to review claims from Almont Surgery Center after having received information that Almont was charging exorbitant sums for Lap-Band surgery.  A review of claims forms confirmed a pattern of high-cost Lap-Band procedures and EGDs.  In response to CIGNA requests for patient notes, GET THIN provided "cookie cutter" notes and documentation that did not support the claims submitted (such as claims for sleep studies where the notes on the patient's history contained no reference to sleep problems).  Based on this review, CIGNA began denying claims based on a lack of pre-certification and, later, on a lack of supporting documentation.

f.      Health Net conducted an investigative audit on GET THIN claims submitted between January 1, 2009 and March 24, 2011 that resulted in Health Net withholding payment on all claims submitted by specified GET THIN providers and demanding repayment of certain claims.  Health Net also submitted a suspected fraud claim form to the California Department of Insurance, and a complaint to the California Board of Medicine.

/ / /

/ / /

28

**C.     Centralized Ownership And Control Of Get Thin**

1.     <u>The Omidis' control of GET THIN and its finances</u>

15.     J. Omidi and M. Omidi were in charge of GET THIN operations, and made final decisions on important matters, including hiring, firing, advertisements, purchases, billing and procedures.

16.     Below is an overview of Omidi-controlled accounts at WFB, where GET THIN maintained accounts until March 2012.

a.     There were more than 150 Omidi-controlled WFB bank accounts (in addition to credit cards, loans, and merchant accounts).

b.     More than 140 of the accounts were under the signature authority of one or more of J. Omidi, M. Omidi, or C. Omidi.

c.     Eighteen of these Wells Fargo accounts had over $220 million in Insurance payments.  The total amount of inbound transactions for these 18 Omidi-controlled accounts (including numerous transfers amongst the accounts) exceeded $300 million during the period between January 2008 and December 2013.

d.     Of these 18 Wells Fargo accounts, seven had over $1 million in deposit/transfer activity during the period between January 2008 and December 2013.  Of these, 11 accounts had over $10 million in payments from insurance companies between January 2008 and March 2012.

e.     Analysis of more than 60 Omidi-controlled accounts at WFB that received deposits paid by insurance companies showed that these accounts received a total of more than $220 million in payments from insurance companies between January 2008 and March 2012.

17.     Numerous GET THIN entities also held bank accounts at Chase between 2010 and 2012.

a.     J. Omidi was the signatory on the accounts for eight GET THIN entities at Chase, and was listed as the "Secretary" for all of those entities.

29

b.      As of December 22, 2010, numerous GET THIN entities gave 269 S Beverly Dr., Suite 1409, Beverly Hills, 90212 as the mailing address.  The "suite" is really a postal box at the same CMRA as was used for numerous GET THIN entities, including MIPS, on GET THIN insurance claims.

c.      GSPM listed C. Omidi and Pezeshk as signatories on its three accounts.

18.      C. Omidi conducted much of the GET THIN banking online, but also engaged in numerous transactions in person.  C. Omidi visited one particular WFB branch 2 to 3 times per week.  She also visited bank branches to open accounts, and made numerous in-person deposits.  C. Omidi was familiar with the Omidi-controlled accounts maintained at WFB to the degree that she had memorized the account numbers.

## 2.      The Omidis and GET THIN employees, agents and attorneys acted as officers or members of GET THIN entities

19.      The investigation revealed the existence of more than 200 Omidi-controlled entities and business name (dbas), identified through bank records, corporate filings, common addresses and financial transactions.

20.      Prior to 2010, one or more of the Omidis was typically listed on corporate paperwork relating to GET THIN entities.  Thereafter, their names were rarely included on such paperwork, having been replaced with names of individuals affiliated with or employed by them.  For example, beginning in or about 2012, Pezeshk was listed as a member or officer of approximately 40 GET THIN entities.  Beginning in approximately 2011, Klasky was listed as the CEO, CFO, an officer and/or manager of approximately 20 GET THIN entities.  Ara Salazar ("Salazar") was listed as the Administrator of approximately 28 GET THIN entities.  Weisse filed incorporation documents for dozens of "Four Letter" corporations (discussed below) in or about 2011.  At the time of formation, most of these entities did not identify any shareholders or officers, and listed an address

associated with Weisse as their mailing address.  Beginning in May 2012, one doctor, Alpert, was listed as the CEO, Director, Secretary, and/or other officer of over 70 "Four Letter" professional corporations.  Silverman was listed as the "Organizer" for 1-800-GET-THIN, LLC and the "Incorporator" for IMS.

### D. Concealment Of Ownership And Efforts To Avoid Scrutiny

#### 1. Formation of additional entities

21.    The transition to entities held in names of Omidi associates and employees rather than the Omidis themselves was accompanied by an increase in the number of entities created.  For example, Beverly Hills Surgery Center, LLC was formed in mid-2009.  At that time, J. Omidi was identified as the CEO and C. Omidi as manager or member of the entity.  About one year later, in mid-2010, five "Beverly Hills" LLC entities were created: Beverly Hills Anesthesia, Beverly Hills Gastroenterology, Beverly Hills Laboratory, Beverly Hills Surgery, and Beverly Hills Ultrasound.  Weisse was listed as the organizer of all five.  No statement of information was initially filed for any of the new entities.  In July 2012, Pezeshk was named as the CEO and member of three of the five, and a fourth in February 2013.

#### 2. The "Four Letter" corporations

22.    In approximately May 2011, M. OMIDI caused the creation of numerous professional corporations referred to her ein as "Four Letter" corporations, so named because the name of each corporation consisted of four letters – specifically, the first two letters of each of a person's first and last name, usually of a doctor.  So, for example, the Four Letter corporation for Dr. Martin Flynn ("Flynn") was "MAFL."  The Four Letter corporations were created by the Omidis (or at their direction) as a billing vehicle so that work being billed by GET THIN to the insurers was more difficult to identify as being billed by a GET THIN entity, which allowed GET THIN to avoid heightened scrutiny by the insurers. The Four Letter corporations, using the initials of doctors performing services on

behalf of GET THIN (and sometimes created without the knowledge of the doctors whose initials were the basis for the names of the corporations) created the false impression that each Four Letter corporation was the professional practice corporation of the physician or other medical professional whose name was used to formulate the name of the corporation.

23. By the time the Four Letter corporations were formed in May of 2011, various insurance providers, including TRICARE and Health Net, had already started questioning and rejecting claims submitted by known GET THIN entities.

24. More than 50 of the Four Letter corporations obtained a National Plan and Provider Enumeration System number, a unique 10-digit number for healthcare providers used to identify them.  These Four Letter corporations listed their respective provider business mailing address as 8581 Santa Monica Boulevard, with a box number as part of the address.  For example, MAFL Medical, Inc. listed box #922; MAPE Medical, Inc. listed box #943; and MIOM Medical, Inc. listed box #991.  Each of these Four Letter corporations also listed the same provider mailing address (9001 Wilshire Boulevard, Suite 106, Beverly Hills, California).

25. Flynn was a doctor who worked for GET THIN.  On or about May 25, 2011, Weisse emailed Flynn and other doctors informing them that "individual corporations have been created on [their] behalf" and seeking permission "to utilize [their] social security number in order to obtain governmental approval required to allow for these corporations to bill for [their] services."  Flynn replied, advising Weisse: "… I DO NOT approve the sort of undertaking you suggest to take place, whether using my name or Social Security number."  Flynn was later told by DeFrank, a GET THIN attorney, that IMS, the entity with which the physicians were under contract at that time, had been "red-flagged by some of the insurers," that "no one's billing slips were being paid due to a single MD's billing," and that the new Four Letter professional corporations would "separate"

32

Flynn so that he would not get "red flagged" and carry "that scarlet letter" with him.

26.     Billings by the Four Letter corporations (and payments received in response to those billings) were not necessarily consistent.  For example, eight checks issued by three insurance companies between October 26, 2011 and January 12, 2012, show the following with respect to Dr. Flynn.

        a.     Two of the eight checks were made payable to "Martin E. Flynn, MD."  Those checks bear handwritten notes that appear to have been written before the checks were deposited into a GET THIN WFB account, that contain the letters "MAFL";

        b.     Two were made payable to "Flynn, Martin E.";

        c.     Two were made payable to "MAFL MED INC"; and

        d.     Two were made payable to "MAFL MEDICAL INC."

Seven of the eight checks include at least a portion of the address 8581 Santa Monica Boulevard (one does not contain any address listing).  Five of the checks were deposited into WFB 3362, held in the name of IMS, which lists the address 269 S. Beverly Drive, Suite 353, Beverly Hills, California.  Two of the checks were deposited into WFB 0200, held in the name of Medical Payment Processing, LLC, which lists the address of 8721 Santa Monica Boulevard, Suite 122, West Hollywood, California.  One check was deposited into WFB 0908, held in the name of Golden State Practice Management, LLC, which lists the address 9107 Wilshire Boulevard, Suite 150, Beverly Hills, California.  The signature card for WFB 3362, dated July 7, 2011, lists the authorized signer as Cindy N. Omidi.  The signature card for WFB 0200, dated March 25, 2011, lists the authorized signers as Cindy N. Omidi, Maziar Michael Omidi and Julian C. Omidi.  The signature card for WFB 0908, dated February 3, 2012, lists the signer as Pezeshk.  The eight checks totaled $111,606.78.

27.     Sometime before July 2011, Weisse approached Dr. Atul Madan ("Madan"), a doctor who also provided services on behalf of GET THIN, about creating a corporation using his name.  Madan was told that GET THIN wanted to create the separate corporations so they could split up the billing.  That way, if there were questions regarding one doctor's billing, the insurance companies would not automatically review everyone's billing.  Tax liability for the separate corporation was to be assumed by IMS.  Madan initially signed the contract but then subsequently terminated his concurrence.

28.     Madan did not know what GET THIN planned on naming the corporation until around October 2011, when he saw "ATMA" on a patient's explanation of benefits form for Madan's services.  Madan called Silverman, who told Madan that a corporation had been created, but it was not Madan's corporation.  Silverman said he could use any name he wanted when creating a corporation and that since Madan was not listed as the owner of the corporation, it should not matter to Madan.

29.     Claims data for the Insurance Companies show that $28 million in claims were submitted in the names of the Four Letter corporations, and $2.4 million was paid on those claims.

30.     The use of this many CMRAs by a group of affiliated entities is highly suspicious.  Large businesses with staffed offices generally receive mail at their offices, as that is both convenient and free.  The use of multiple CMRAs requires the recipient to pay for the rental of the boxes, and pick up mail at multiple locations.  GET THIN'S use of CMRAs was a tactic used to create a misleading appearance of independent entities in order to conceal from insurers, and others the common ownership of and control over the GET THIN entities, and the volume of their activity.

/ / /

/ / /

34

3.   Further efforts to disguise the Omidi's ownership and control of GET THIN

31.   The Omidis took other affirmative steps to hide their ownership and control of GET THIN, especially after negative media coverage or the initiation of lawsuits against the entities.  GET THIN employees were instructed to tell people outside of the enterprise that the Omidis did not work there.  Employees were also told (falsely) that the Omidis did not own anything and were not tied to any companies.

32.   A "Joint Manager/Consultant Meeting Agenda" dated January 4, 2011 includes a "reminder" on the agenda that

> Dr. Michael and Julian are consultants.  Dr. Julian is a consultant for our marketing department.  Dr. Michael is a practicing physician and is part of our medical staff.  They do not have any financial interest in the company.  They do not participate in any decision making of the company.

These statements were false.

33.   A September 27, 2011 email from Macatangay directed to over 30 individuals (including Salazar, Klasky and Abaca), referenced a Los Angeles Times article about the death of a GET THIN patient as "another hate article," and stated that:

> It is now important that we, as a unified organization, set the record straight every time we can.  The following need to be emphasized to every member of your team so they, in turn, can inform the public whenever they can: . . .
>
> 5.  1-800-GET-THIN does not refer patients including this one to our surgery center.
>
> 6.  There is no such "joint venture" that includes the surgery centers and the 1-800-GET-THIN marketing firm, as mentioned in the article!

35

7.   Dr. Michael OMIDI & Julian OMIDI are not involved in any "joint venture" as alleged in the article. . .

These statements were false.

## IV.   THE DEFENDANT FUNDS AND SECURITIES

### A.   Summary of Get Thin Insurance Claims and Payments Made On Those Claims

34.   According to Claims data for GET THIN provided by Anthem Blue Cross,[11] Aetna, United, CIGNA, Health Net, and TRICARE prior to June 2014, for the periods specified below ("claims data"):

a.   GET THIN billed Anthem Blue Cross approximately $503 million for services allegedly provided between January 2008 and December 2011 to approximately 7,400 patients.  Anthem Blue Cross paid approximately $80 million on those claims.

b.   GET THIN billed Aetna approximately $168 million for services allegedly provided between January 2008 and June 2013 to approximately 2,200 patients.  Aetna paid approximately $54 million on those claims.

c.   GET THIN billed United at least approximately $119 million for services allegedly provided between January 2008 and August 2011 to approximately 1,700 patients.  United paid approximately $35 million on those claims.

d.   GET THIN billed CIGNA approximately $41 million for services allegedly provided between February 2008 and August 2012 to approximately 800 patients.  CIGNA paid almost approximately $9 million on those claims.

e.   GET THIN billed Health Net approximately $22 million for services allegedly provided between January 2008 and February 2012 to

---

[11] Anthem Blue Cross data includes data for some other Blue Cross/Blue Shield programs.

36

approximately 300 patients.  Health Net paid approximately $3 million on those claims.

          f.     GET THIN billed TRICARE approximately $67 million for services allegedly provided between January 2008 and November 2013 to approximately 700 patients.  TRICARE paid approximately $2 million on those claims.

          g.     In total, during the specified time frames, GET THIN billed these six insurance providers more than $900 million for services allegedly provided to at least 13,500 patients, and these six providers paid $183 million on those claims.  Within these totals, amounts billed and paid for the categories of service specified below[12] were:

| Category of Service | $$ Billed | $$ Paid |
| --- | ---: | ---: |
| Lap-Band surgery | $169.5M | $54.6M |
| Lap-Band adjustments | $70.5M | $9.2M |
| Lap-Band removals | $1.6M | $.2M |
| EGDs | $94.5M | $17.7M |
| Anesthesia | $90.8M | $14.7M |
| Sleep studies | $36.6M | $7.3M |
| Physician office visits | $16.4M | $2.2M |

[12] The specific category amounts at the top of the chart do not include facility fees for Anthem and CIGNA because the facility claims data those companies provided did not include CPT codes, which were used for the amounts set forth in the chart.  Anthem and CIGNA facility fees for the diagnosis code 278.01 "morbid obesity" are included separately at the bottom of the chart.

37

| | | |
|---|---|---|
| Physician office consultations | $6.2M | $.9M |
| Psychological evaluations and testing | $2.8M | $.2M |
| Nutritional consultations | $.6M | $.07M |
| Anthem Blue Cross Morbid Obesity Facility Fees | $65.5M | $22.7M |
| CIGNA Morbid Obesity Facility Fees | $10.3M | $2.1M |
| Totals | $565.3M | $131.87M |

h.     GET THIN also billed and received payments for medical services from other insurance companies, patients, and patients' employers.

**B.     The Manipulation of GET THIN Funds**

1.     <u>The WFB accounts</u>

35.     Plaintiff alleges that the entirety of the defendant funds either represent or are traceable to proceeds of the fraud scheme described herein (that is, they represent or are traceable to proceeds of mail fraud, wire fraud, and/or health care fraud), were involved in one or more money laundering transactions, or both.

36.     Over the course of the scheme, GET THIN fraudulently billed the Insurance Companies, patients, health plans and other health care providers for services that were either not rendered at all, not rendered in a manner that made them eligible for coverage or reimbursement, or were otherwise improper. Payments made in response to those fraudulent billings were deposited into GET THIN accounts (meaning accounts held in the name of a GET THIN principal or entity, or an account otherwise controlled by the Omidis). The funds were then often transferred among dozens of other GET THIN accounts controlled by the Omidis or others working on their behalf, including lawyers.

37.     Money laundering is the process of making illegally-gained proceeds (*i.e.*, "dirty money") appear legal (*i.e.*, "clean"). Typically, it involves three steps:

38

placement, layering and integration.  In the placement stage, illegitimate funds are introduced into the legitimate financial system, usually by deposit into one or more bank accounts.  In the layering stage, the money is moved around amongst accounts at one or more financial institutions to create confusion about the nature, source, location, ownership or control of the funds.  The layering stage may be accomplished through wire transfers (intra-bank or inter-bank), cash withdrawals and deposits, or the use of checks.  Typically, the money is filtered through accounts in different names (of entities and/or natural persons) that are controlled by the launderer(s).  In the integration stage, the money is filtered into the financial system through additional transactions until the tainted money appears legitimate. It is common for launderers of criminal proceeds to engage in a series of financial transactions among bank accounts in the names of separate but related corporate entities for no apparent business purpose, as occurred here.

38.     After the fraudulently obtained insurance payments were deposited into and layered through Omidi-controlled accounts, sometimes at more than one bank, they were transferred into the accounts listed in paragraph 5, among others. To the extent that any of the funds and securities listed in paragraph 5 (that is, the defendant funds and securities) do not represent or are not directly traceable to proceeds of the criminal violations described herein, those funds were intermingled with the tainted funds with the intent to conceal or disguise the nature, source, location, ownership or control of the tainted funds, or to promote additional illegal activity.

39.     During that period, more than $220 million in insurance payments were deposited into 18 Omidi-controlled accounts at WFB.  These 18 accounts were among the more than 150 Omidi-controlled accounts at WFB, more than 140 of which were under the signature authority of either C. Omidi, J. Omidi, or M. Omidi, and more than 60 of which are believed to have received deposits directly of insurance payments related to the GET THIN entities.   As noted above and

below, the total amount of inbound transactions for 18 linked WFB accounts, including transfers amongst the accounts, exceeded $400 million.

40.     The 18 Omidi-controlled accounts referenced above were funded with substantial deposits of checks issued by insurance companies for medical services. In many instances, the payee on a deposited check was different than the name of the account holder listed on the account.

41.     The movement of funds amongst and between the 18 Omidi-controlled accounts at WFB was byzantine and lacking in any discernible purpose other than the obfuscation of the nature, source, location, control and ownership of the money.  Moreover, the names on the Omidi-controlled accounts offer no obvious explanation as to the purpose of the transfers, and the sheer number of accounts has no apparent legitimate purpose.  There is no discernible pattern of money flowing into or out of certain accounts for any identifiable reason.  Indeed, the analysis demonstrates that the money flow was seemingly random – money often left an account only to be transferred back into that same account a short time later – until it reached the DB accounts, where it was pooled.  Below is a partial summary of the insurance payments and transfers relating to the 18 WFB accounts.

a.     Between January 1, 2008 and December 2013, approximately 50,000 credits posted to the 18 WFB accounts, totaling approximately $400 million.  The chart below shows approximate totals deposited into the 18 accounts by the top five insurers, totaling approximately $127,475,024.

| $43,352,921 | Aetna Life Insurance Company |
| $40,143,454 | United HealthCare Insurance Company |
| $20,442,668 | Anthem Blue Cross |
| $13,587,894 | CIGNA (Connecticut General Life Insurance Company) |
| $7,986,186 | Anthem Blue Cross & Blue Shield |

42.     The transfers do not appear to have been motivated by interest sensitivity, either.  For example, more than $13 million was held in two Omidi-controlled accounts in the name of JER Collection Specialists, Inc. at BofA.  C. Omidi, J. Omidi and M. Omidi had signature authority over the two accounts.  On September 2, 2011, $13,789,986.18 was transferred from an interest bearing account (BofA 3865) to a non-interest bearing account (BofA 3836), where the money remained until February 16, 2012 (over five months), when it was transferred to other accounts.  These funds ultimately came to rest in several of the defendant DB accounts.

## V.     ACQUISITIONS OF REAL ESTATE DURING THE RELEVANT PERIOD

43.     The following real estate acquisitions were made by one or more of the Omidis or an Omidi-controlled entity during the relevant period:

a.     Real property in Palmdale, CA (Los Angeles County Assessor's ID number 3003-002-011 & 26), purchased in 2003 for approximately $1,250,000 by Pacific West Dermatology, and subsequently transferred to C. Omidi on July 10, 2008.

b.     Real property in Woodland Hills, CA (Los Angeles County Assessor's ID number 2171-012-032), purchased on January 28, 2010 for $410,000 by OCM 26, LLC.  $402,750 was wire transferred from Top Surgeons, WFB 9717 on January 27, 2010 to purchase the property.

c.     Real property in West Hollywood, CA (Los Angeles County Assessor's ID number 4392-016-028), purchased on May 7, 2010 for $8,400,000 by FJKJ, LLC.  Payments of $8,400,000 and $20,831.55 were made using cashier's checks purchased on May 4, 2010, and May 6, 2010, respectively, with funds from Top Surgeons WFB 6262.

d.     Two real properties were acquired and a note securing a third property was purchased with funds drawn from a "deposit holding escrow"

41

account, as follows: $9,400,000 was deposited into the deposit holding escrow account between January 14, 2011 and September 30, 2011.  These funds were transferred from Omidi-controlled bank accounts.  Specifically, $400,000 was transferred from WFB 4735 on January 14, 2011; $4,000,000 was transferred from WFB 1929 on February 28, 2011; and $5,000,000 was transferred from BofA 3190 on September 30, 2011.  An additional $1,699,000 was also transferred to the deposit holding escrow on August 2, 2011 from another cancelled escrow where $1,700,000 was wire transferred from WFB 1929 on April 25, 2011.

　　　　　　　i.　　　The first piece of real property acquired with these funds was a commercial property located at 1700 Pointe Drive, Valparaiso, IN (Porter County Assessor's ID number 64-10-07-328-001), acquired for $2,000,000 in the name of SCM on March 18, 2011.

　　　　　　　ii.　　　The second piece of real property acquired with these funds was a commercial property located at 1980 North Orange Grove Avenue, Pomona, CA (Los Angeles County Assessor's ID number 8362-007-050), acquired for $1,100,000 in the name of Orange Grove Surgery Center, LLC on April 22, 2011.

　　　　　　　iii.　　　$2,700,000 was used to purchase a note secured by 3434 Midway, San Diego, CA in the name ASC Capital Management, Inc. on November 22, 2011, (the real property was transferred to Summit Properties, LLC on April 1, 2014).  An additional $150,000 was wire transferred directly to the escrow from WFB 4989 on November 16, 2011.

　　　　　　　iv.　　　Finally, $3,651,039.39 was transferred to WFB 0200 on March 7, 2012.

　　　　　e.　　　Real property in Malibu, CA (Los Angeles County Assessor's ID number 4450-005-052), purchased on December 4, 2012 for $500,000 by Beverly Hills Estate, LLC.  $487,616.61 was transferred from Chase 7697 to purchase the property.

42

f.       Real property in West Hollywood, CA (Los Angeles County Assessor's ID number 4392-016-029), purchased on December 10, 2013, for $2,700,000 in the name of Beverly Hills Estate, LLC, using a transfer of $2,705,261.34 from Chase 7697 on December 4, 2013.

### FIRST CLAIM FOR RELIEF

(18 U.S.C. § 981(a)(1)(C))

44.     Based on the facts set out above, plaintiff alleges that the defendant assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the ground that they are property that constitutes or was derived from proceeds traceable to one or more violations of 18 U.S.C. §§ 1035, 1341, 1343, and/or 1347.

### SECOND CLAIM FOR RELIEF

(18 U.S.C. § 981(a)(1)(A))

45.     Based on the facts set out above, plaintiff alleges that the defendant assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the ground that they are property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 or 1957.

WHEREFORE, plaintiff United States of America prays that:

(a)     due process issue to enforce the forfeiture of the defendant;

(b)     due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)     that this Court decree forfeiture of the defendant to the United States of America for disposition according to law; and

/ / /

/ / /

/ / /

/ / /

/ / /

        (d)    for such other and further relief as this Court may deem just and
proper, together with the costs and disbursements of this action.


DATED: May 8, 2018          TRACY L. WILKISON
                            Attorney for the United States
                            Acting Under Authority Conferred by 28 U.S.C. § 515
                            LAWRENCE S. MIDDLETON
                            Assistant United States Attorney
                            Chief, Criminal Division

                                 /s/ Steven R. Welk
                            STEVEN R. WELK
                            Assistant United States Attorney
                            Chief, Asset Forfeiture Section

                            Attorneys for Plaintiff
                            UNITED STATES OF AMERICA

<u>VERIFICATION</u>

I, Zeva Pettigrew, hereby declare that:

1.      I am a Special Agent with the U.S. Food and Drug Administration, and am the case agent for the forfeiture matter entitled *United States of America v. Approximately $107,539,422.29 in Funds and Securities*.

2.      I have read the above Verified Complaint for Forfeiture *In Rem* and know its contents.  It is based upon my own personal knowledge and reports provided to me by other law enforcement agents, which I believe to be reliable.

3.      Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 8th, 2018 in Los Angeles, California.

ZEVA PETTIGREW

45